28 F.3d 1430
 29 Fed.R.Serv.3d 451
 Dennis J. HASTERT, Harris Fawell, John E. Porter, Philip M.
Crane, Henry J. Hyde, Robert H. Michel, and Thomas
W. Ewing, Plaintiffs-Appellants,
and
Johnny Scott and Ben Howard, Plaintiffs-Intervenors-Appellants,
v.
ILLINOIS STATE BOARD OF ELECTION COMMISSIONERS, John J.
Lanigan, Theresa M. Petrone, Richard A. Cowen, Hannelore
Huisman, Lawrence E. Johnson, David E. Murray, Langdon D.
Neal and Wanda T. Rednour, Defendants-Appellees.
Dennis J. HASTERT, Harris Fawell, John E. Porter, Philip M.
Crane, Henry J. Hyde, Robert H. Michel, and Thomas
W. Ewing, Plaintiffs-Appellants,
v.
STATE BOARD OF ELECTIONS, John J. Lanigan, Theresa M.
Petrone, Richard A. Cowen, Lawrence E. Johnson,
David E. Murray, Langdon D. Neal, Wanda
T. Rednour and Hannelore
Huisman,
Defendants-
Appellees.
Wilfredo NIEVES, Al Johnson, Linda Coronado, Bobby Rush,
Jesus Garcia, Rev. Willie Barrow, Rafael Boria, Miguel Del
Valle, Robert L. Lucas, Leon D. Finney, Jr., Rev. Clay
Evans, Joseph Gardner, Luis V. Gutierrez, Regner Suarez,
Joseph Berrios, Miguel A. Santiago, and Neomi Hernandez,
Plaintiffs-Appellants,
v.
ILLINOIS STATE BOARD OF ELECTION COMMISSIONERS, John J.
Lanigan, Theresa M. Petrone, Richard A. Cowen, Hannelore
Huisman, Lawrence E. Johnson, David E. Murray, Langdon D.
Neal and Wanda T. Rednour, Defendants-Appellees.
The CHICAGO URBAN LEAGUE, Craig R. Collins, Mark Allen, and
Nikolas C. Theodore, Plaintiffs-Appellants,
v.
STATE BOARD OF ELECTIONS, John J. Lanigan, Theresa M.
Petrone, Richard A. Cowen, Lawrence E. Johnson,
David E. Murray, Langdon D. Neal and
Wanda T. Rednour,
Defendants-Appellees.
Ann ROSEBROOK, Daryl Barklow, Amiel Cueto, Richard Mark,
Jeanelle Norman, Carolyn Toney, Lee Babcock, Raymond Oliver,
Barbara Poshard, William Matthews, Gerald Hawkins, and Eva
Savala, Plaintiffs-Appellants,
v.
STATE BOARD OF ELECTIONS, John J. Lanigan, Theresa M.
Petrone, Richard A. Cowen, Hannelore Huisman,
Lawrence E. Johnson, David E. Murray,
Langdon D. Neal and Wanda T.
Rednour, Defendants-Appellees.
 Nos. 92-1397 to 92-1399, 92-1402 and 92-1403.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 7, 1993.
Decided Dec. 17, 1993.
Rehearing Granted and Opinion
Amended June 1, 1994.*
 
 Charles F. Marino, David M. Marino, Tyrone C. Fahner, George J. Tzanetopoulos, Richard S. Williamson, Lori E. Lightfoot, James D. Holzhauer (argued), Kirsten Jo Felling, Mayer, Brown & Platt, Chicago, IL, for plaintiffs in No. 92-1397.
 Deborah L. Ahlstrand, Asst. Atty. Gen., Chicago, IL (argued), for defendants-appellees in No. 92-1397.
 Jeffrey D. Colman (argued), Thomas S. O'Neill, Jenner & Block, Chicago, IL, Clyde Kuehn, Kuehn & Trentman, Belleville, IL, for intervenors-appellants in No. 92-1397.
 William T. Barker, Barbara L. Smith, Sonnenschein, Nath & Rosenthal, Harvey M. Grossman, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for amicus curiae in No. 92-1397.
 Judson H. Miner, Paul Strauss, Jeffrey Cummings, Davis, Miner, Barnhill & Galland, Ruben Castillo (argued), Kirkland & Ellis, Arturo Jauregui, Ricardo Meza, Mexican American Legal Defense & Educ. Fund, Chicago, IL, for plaintiffs-appellants in No. 92-1399.
 Mark Leipold, Oppenheimer, Wolff & Donnelly, Roslyn C. Lieb, Chicago Lawyers' Committee, Chicago, IL, Brenda Wright, Washington, DC, Mark S. Grotefeld (argued), Robins, Kaplan, Miller & Ciresi, Chicago, IL, for plaintiffs-appellants in No. 92-1402.
 William J. Harte (argued), Joseph E. Tighe, Stephen L. Garcia, Courtney Carlton Nottage, Edward T. Joyce, Paul A. Castiglione, Kubasiak, Cremieux & Fylstra, Chicago, IL, for plaintiffs-appellants in No. 92-1403.
 Before CUDAHY, COFFEY and ROVNER, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 We are asked here to review a decision of a three-judge district court denying attorneys' fees to certain parties involved in litigation regarding congressional redistricting in Illinois following the 1990 census. We initially decided that we had jurisdiction over the appeals brought by the Hastert, Nieves, Urban League and Scott plaintiffs, but jurisdiction over the Rosebrook appeal only to the extent that they appealed the district court's denial of their Rule 60(b) motion to reconsider its judgment. Hastert v. State Board of Election, Nos. 92-1397, 92-1398, 92-1399, 92-1402 & 92-1403 slip op. at 11-12 (7th Cir. Dec. 17, 1993). We then affirmed the district court's determination that the Hastert and Nieves plaintiffs were prevailing parties, id. at 14, and that the Urban League plaintiffs were not, id. at 15-17. But we reversed the district court's determination that the Scott plaintiffs were not prevailing parties. Id. at 14-15. Finally, we reversed the decision that there existed "special circumstances" precluding an awarding of fees to the prevailing parties. Id. at 17-19. The Rosebrook plaintiffs, the State Board of Election and the Urban League have since filed petitions for rehearing. We today grant in part the petition filed by the Rosebrook plaintiffs and grant the petition of the Urban League plaintiffs. As a consequence, we issue this amended opinion.
 
 I.
 
 2
 We are presented initially with some rather puzzling jurisdictional questions. To resolve them, we must recount the procedural history of this litigation in regrettably copious detail.
 
 
 3
 Because Illinois' population grew during the 1980s at a rate slower than that of the United States as a whole, the number of congressional seats apportioned to Illinois was reduced from 22 to 20. The task thus fell to the Illinois legislature to implement a constitutionally acceptable congressional redistricting plan, taking into account the fewer districts allocated to the state.[1] This is not an easy task under any circumstances, but it may be virtually impossible when the governor is of a different political party than a majority of the members of both houses of the legislature.[2] Such was the situation in Illinois in 1991. And, quite predictably, the Illinois General Assembly failed to enact a redistricting plan by the constitutionally mandated June 30, 1991 deadline. Indeed, the legislature failed even to bring a redistricting plan to the floor for debate.
 
 
 4
 Anticipating this legislative deadlock, the Republican Party members of the Illinois congressional delegation (the "Hastert" plaintiffs or group) filed the initial action in this matter on June 27, 1991. The Hastert plaintiffs sought a declaration that the present Illinois congressional districts were unconstitutional because of changes reflected in the 1990 census. They also sought to enjoin the Illinois State Board of Elections from conducting the 1992 congressional elections under the congressional district plan then in effect, and submitted their own redistricting proposal to replace the outdated map. The Chief Judge of this court convened a three-judge district court to hear the case, as 28 U.S.C. Sec. 2284(a) requires.
 
 
 5
 On July 3, 1991, a group of Hispanic and African-American voters (the "Nieves" plaintiffs or group) filed a similar action. Actually, the "Nieves" plaintiffs frequently participated as two separate sub-groups--an Hispanic sub-group and an African-American sub-group. These sub-groups were often represented by different lawyers. In addition to the relief requested by the Hastert group, the Nieves plaintiffs (both sub-groups) sought the creation of a congressional district containing a majority of Hispanic voters which, they maintained, section two of the Voting Rights Act, 42 U.S.C. Sec. 1973, required. The Nieves and Hastert actions were later consolidated.
 
 
 6
 On July 24, 1991, a group of voters ostensibly acting on behalf of certain members of the Illinois congressional delegation affiliated with the Democratic Party (the "Rosebrook" plaintiffs or group) filed still another similar action, which was subsequently consolidated with the Hastert and Nieves cases. On the same day, U.S. Representative Cardiss Collins and U.S. Representative Charles Hayes, along with several voters from their respective African-American majority districts (the "Collins" plaintiffs or group), filed a fourth action that was also consolidated with the Hastert and Nieves cases. Finally, the Chicago Urban League, representing the interests of voters in the existing African-American majority congressional districts (the "Chicago Urban League" plaintiffs or group), filed its own suit on August 29, 1991. This too was consolidated with the others.[3]
 
 
 7
 The district court issued its decision on the merits on November 6, 1991, enjoining the Board from using the existing congressional district plan and ordering it to put into effect the plan proposed by the Hastert plaintiffs. Hastert v. State Board of Elections, 777 F.Supp. 634 (N.D.Ill.1991). In the final sentence of its opinion, the district court ordered that "all parties to these consolidated cases bear their own costs." 777 F.Supp. at 662. On November 14, 1991, the Hastert, Nieves, Chicago Urban League and Scott groups moved the district court to alter or amend its judgment to award them costs as prevailing parties. They also filed a petition for an award of their respective attorneys' fees pursuant to 42 U.S.C. Secs. 1973l(e) and 1988. On November 21, 1991, the Collins plaintiffs moved the court for leave to file a petition for attorneys' fees. Also on November 21, the Rosebrook plaintiffs filed a Rule 59(e) motion to alter or amend the judgment.[4] While this motion was still pending, the Rosebrook plaintiffs filed, on December 24, 1991, a motion for leave to file a petition for attorneys' fees and expenses.
 
 
 8
 The district court denied the Rosebrook plaintiffs' Rule 59(e) motion on December 27, 1991, and on January 7, 1992, the court denied as untimely their motion for leave to file a petition for fees. On January 13 the Rosebrook group moved the court to reconsider its denial of their fee motion. On January 17, 1992, the district court issued a memorandum opinion denying the Hastert, Nieves, Collins, Chicago Urban League and Scott groups' motions for costs and attorneys' fees. Hastert v. State Board of Elections, 794 F.Supp. 254 (N.D.Ill.1992). In the same opinion, the court ordered that the cost of publishing notices of the action in newspapers throughout the state be divided equally among the Hastert, Nieves, Rosebrook and Collins groups. 794 F.Supp. at 261. Four days later, on January 21, the court denied as moot the Rosebrook plaintiffs' January 13 motion for reconsideration.
 
 
 9
 On January 28, the Nieves plaintiffs moved the district court to reconsider its January 17 decision denying attorneys' fees. The Hastert plaintiffs filed an identical motion on January 29. On January 31, the Collins plaintiffs moved the court to reconsider its denial of attorneys' fees and its allocation of the costs of publishing notice. The district court has never ruled on these motions. Several plaintiff groups next sought to vest jurisdiction in this court. The Scott plaintiffs on February 13, the Hastert and Nieves plaintiffs on February 14, and the Chicago Urban League group on February 18, filed notices of appeal with respect to the district court's January 17 decision denying attorneys' fees. Also on February 18, the Rosebrook plaintiffs filed a notice of appeal with respect to the district court's November 6, 1991 judgment; the December 27 order denying their motion to alter or amend that judgment; the January 7, 1992 order denying their motion for leave to file a petition for fees; the January 17 opinion and the January 21 order denying their motion to reconsider. The Collins plaintiffs had not filed a notice of appeal by the time these cases were set for argument on appeal.[5]
 
 
 10
 We have jurisdiction here, if at all, pursuant to 28 U.S.C. Sec. 1291, which vests in the courts of appeals jurisdiction over "all final decisions of the district courts of the United States." As an initial matter, we note that we do not have jurisdiction over the merits of this case because such appeals must be made directly to the United States Supreme Court. See 28 U.S.C. Sec. 1253 ("[A]ny party may appeal to the Supreme Court from an order [pertaining to an] injunction in any ... action ... required ... to be heard and determined by a district court of three judges") and 28 U.S.C. Sec. 1291 (courts of appeals have jurisdiction of appeals from final decisions of the district courts "except where direct review may be had in the Supreme Court").[6] Appeal from the district court's denial of attorneys' fees, however, is properly made to this court. See Supreme Court of Virginia v. Consumers Union, 446 U.S. 719, 737 n. 16, 100 S.Ct. 1967, 1977 n. 16, 64 L.Ed.2d 641 (1980) (Supreme Court does not have jurisdiction under Sec. 1253 if only attorneys' fees questions are appealed). It thus follows that awards of attorneys' fees are appealable independent of the merits and constitute separate judgments for purposes of Sec. 1291. People Who Care v. Rockford Board of Education District No. 205, 921 F.2d 132, 134, 135 (7th Cir.1991). But such fee awards, or in this case denials, must be final in order to trigger our Sec. 1291 jurisdiction.
 
 
 11
 The district court's November 6 opinion was unquestionably a final decision on the merits. But there is a considerable question whether it said anything, final or otherwise, about attorneys' fees. The only pronouncement of the district court in its November 6 opinion that might be construed to reach the attorneys' fees issue is its final sentence: "[P]arties to these consolidated cases shall bear their own costs." 777 F.Supp. at 662. Sections 1973l(e) and 1988 provide that "prevailing parties" in actions to enforce constitutional voting guarantees and certain provisions of the civil rights laws are entitled to "a reasonable attorney's fee as part of the costs." Thus, there is no logical impediment to concluding that the district court's November 6 decision resolved, albeit sub silentio, the parties' entitlement to attorneys' fees. However, we are not entirely convinced that this is a correct view, and we are quite certain that the language of the district court, if intended to deal with attorneys' fees (in addition to routine court costs ), was ill-chosen. Indeed, it would not be irrational to conclude that the district court's order had nothing to do with attorneys' fees.
 
 
 12
 Federal Rule of Civil Procedure 54(d) provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." The Supreme Court has instructed that 28 U.S.C. Sec. 1920 defines the term "costs" as it is used in Rule 54(d). Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987). Section 1920 authorizes the taxation of certain rather routine litigation expenses, including clerk, marshal and court reporter fees, "as costs." Although Rule 54(d) creates a presumption that the prevailing party will recover these costs, the decision to make the award of costs is entrusted to the sound discretion of the district court. Soler v. Waite, 989 F.2d 251, 254-55 (7th Cir.1993). As a result, district courts routinely direct that prevailing parties are not entitled to Rule 54(d) costs through concise orders, frequently no longer than a single sentence. See, e.g., Tolle v. Carroll Touch, Inc., 813 F.Supp. 1368 (C.D.Ill.1993); Harlan E. Moore Charitable Trust v. United States, 812 F.Supp. 130 (C.D.Ill.1993); Nalco Chemical Co. v. Hydro Technologies, Inc., 809 F.Supp. 672 (E.D.Wis.1992); Ridgefield Park Transportation v. Uhl, 803 F.Supp. 1467 (S.D.Ind.1992). The district court's November 6 "tag line" that the parties to this litigation were to "bear their own costs" is arguably an adequate exercise of its discretion to deny Rule 54(d) costs, as that term is defined by 28 U.S.C. Sec. 1920.[7] But attorneys' fees would seem to be "costs" of a different sort.
 
 
 13
 Before the Supreme Court decided Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), many federal courts believed that they had the power in certain cases, contrary to the so-called "American" rule that parties are to bear their own costs of legal representation, to award attorneys' fees to prevailing parties as a component of Rule 54(d) costs. In Alyeska, however, the Court disapproved this practice and held that federal courts may order the losing party to pay the winner's attorneys' fees only if Congress has authorized such fee awards by statute. Id. at 263-64, 95 S.Ct. at 1624-25. There is no dispute that sections 1973l(e) and 1988 are statutes of this type nor, as a result, is there any question that the district court had the power to decide which parties to the present litigation, if any, were entitled to attorneys' fees. There is legitimate room for doubt, however, that the district court exercised this power on November 6.
 
 
 14
 It is true that even after Alyeska we continued to treat requests for attorneys' fees under section 1988 as motions for costs governed by Rule 54(d). See Hairline Creations, Inc. v. Kefalas, 664 F.2d 652, 659 (7th Cir.1981) and Bond v. Stanton, 630 F.2d 1231, 1234 (7th Cir.1980), cert. denied sub nom. Blinzinger v. Bond, 454 U.S. 1063, 102 S.Ct. 614, 70 L.Ed.2d 601 (1981). But this is the only similarity section 1988 attorneys' fees have to Rule 54(d) costs. While district courts have broad discretion to award or deny Rule 54(d) costs, their "discretion to deny a fee award [under section 1988] to a prevailing party is narrow." New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 68, 100 S.Ct. 2024, 2033, 64 L.Ed.2d 723 (1980). Indeed, we have held that prevailing civil rights plaintiffs are entitled to their attorneys' fees "as a matter of course." Entertainment Concepts, Inc. III v. Maciejewski, 631 F.2d 497, 506 (7th Cir.1980), cert. denied, 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). See also Dawson v. Pastrick, 600 F.2d 70, 79 (7th Cir.1979). Although a district court may be able to dispose of routine Rule 54(d) costs with a single, off-hand line at the end of a lengthy decision on the merits, a denial of section 1988 attorneys' fees would seem to require more deliberation and an explicit disposition.
 
 
 15
 Admittedly, we cannot know with any degree of certainty whether the district court here considered the attorneys' fee issue before issuing its November 6 opinion. We note, however, that the district court's January 17 decision on this issue occupies five pages in the Federal Supplement. There is something troubling about disposing of a matter with a single line (and with no explicit reference to fees) that later requires resolution by a thorough written opinion. Moreover, we have found nothing in the record to suggest that the parties put the fees issue properly before the district court until they filed their petitions for fees at various times after November 6. Nevertheless, the district court stated its view that it had indeed addressed the question of attorneys' fees in its November 6 opinion. 794 F.Supp. at 258. The district court is in the best position to interpret its own orders, and we will not disturb such an interpretation absent a clear abuse of discretion. In the Matter of Chicago, Rock Island & Pacific R.R., 865 F.2d 807, 810 (7th Cir.1988). Therefore, although the form of the November 6 opinion creates puzzling ambiguities and procedural difficulties and may be misleading to litigants, the district court's interpretation of this opinion is not a clear abuse of discretion.
 
 
 16
 Characterizing the November 6 opinion as a final decision both on the merits and as an award of attorneys' fees has important jurisdictional consequences. Specifically, if the parties wished to challenge such a denial of attorneys' fees they had only two choices. They could appeal the decision within thirty days, Fed.R.App.P. 4(a)(1), or they could toll the time for appeal by filing a Rule 59(e) motion to alter or amend judgment within ten days, exclusive of weekends and holidays. None of the parties in the first instance chose to appeal the November 6 order insofar as it pertained to attorneys' fees. The Hastert, Nieves, Chicago Urban League and Scott groups, however, did file a timely Rule 59(e) motion on November 14.[8] The district court denied this motion on January 17. The thirty day period for filing an appeal therefore ran from January 17, and expired (computing time as Fed.R.App.P. 26(a) requires) on February 18. The Hastert, Nieves, Scott and Chicago Urban League notices of appeal were therefore all timely filed.[9] We thus have jurisdiction over their appeals.
 
 
 17
 But unlike the other plaintiffs, the Rosebrook plaintiffs did not themselves appeal the November 6 order within 30 days or file an appeal-delaying Rule 59(e) motion within ten days. But their notice of appeal was nonetheless timely filed since Fed.R.App.P. 4(a)(4) says that if a "timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party ... under Rule 59 to alter or amend the judgment ..., the time for appeal for all parties shall run from the entry of the order denying ... such motion" (emphasis added). The effect of Rule 4(a)(4) is to allow a party who neither moves the district court to amend its judgment nor appeals in a timely fashion to bootstrap onto another party's timely filed notice of appeal. Because the Rosebrook plaintiffs filed their notice of appeal on February 18, we have jurisdiction over their appeal from the November 6 order. And this is true despite the fact the Rosebrook plaintiffs' own Rule 59(e) motion to amend the judgment--filed after the ten day period for such motions had run--was properly denied as untimely.
 
 II.
 
 18
 Thus having ascertained our jurisdiction, we now turn to the merits. Under 42 U.S.C. Sec. 1973l(e), a court "in its discretion, may allow the prevailing party a reasonable attorney's fee" in an action, such as this one, "to enforce the voting guarantees of the fourteenth or fifteenth amendments." Pursuant to 42 U.S.C. Sec. 1988, a court may make a similar award of fees to a "prevailing party" in a suit to enforce the provisions of 42 U.S.C. Sec. 1983.[10] Although the statutes commit fee awards to the district court's discretion, Congress has nevertheless made clear that prevailing plaintiffs "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." S.Rep. 925, 94th Cong., 1st Sess. 40 (1975), reprinted in 1975 U.S.C.C.A.N. 774, 807 (addressing Sec. 1973l(e)); S.Rep. 1011, 94th Cong., 2d Sess. 4 (1976), reprinted in 1976 U.S.C.C.A.N. 5908, 5912 (addressing Sec. 1988). In any event, our analysis begins by determining which parties, if any, prevailed.
 
 
 19
 This is not ordinary litigation. Most notably, the underlying controversy in this case, i.e., the fight over the configuration of Illinois' new congressional districts, was not between the plaintiffs and the defendant. The State Board of Elections is truly a nominal defendant, completely disinterested in the outcome of that fight. The real dispute was among the various plaintiffs. Each had a plan to offer and the winner, at least from a lay person's perspective, is the litigant whose plan and objectives (usually incorporated in its map) the district court adopted. Conveniently, this common-sense understanding of winners and losers coincides in large part with the Supreme Court's definition of "prevailing party."
 
 
 20
 A party prevails, within the meaning of the fee-shifting statutes, "if [it] succeeds on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). We agree with the district court, that "the principal issue in litigation during these proceedings involved the determination of which proposed [congressional districting] plan for the entire State of Illinois best met constitutional and statutory criteria." 794 F.Supp. at 259. On this score, the Hastert group is the clear winner, as the district court ultimately adopted its plan.
 
 
 21
 We also agree with the district court's conclusion that the Nieves plaintiffs prevailed. The Nieves plaintiffs brought suit on behalf of African-American and Hispanic voters, and sought the adoption of a map that created Illinois' first ever Hispanic majority congressional district. This was achieved without diluting the strength of the three existing African-American majority districts that were established in the 1981 redistricting. The Nieves group was thus, as we have noted, made up of two sub-groups, described throughout the litigation as the "African-American Nieves" and "Hispanic Nieves" plaintiffs. These two groups were at times represented separately before the district court and sometimes took differing positions. But the two sub-groups acted in concert in petitioning for attorneys' fees, and the district court did not distinguish between them in declaring that "the Nieves group" prevailed. In support of its conclusion, the district court cited the fact that the Nieves plaintiffs played an instrumental role in the creation of the Hispanic super-majority district, as well as the fact that they "formally adopted" the prevailing Hastert map. 794 F.Supp. at 260. We agree with the district court's conclusion that the Nieves group should be considered a "prevailing party" in this litigation, primarily because its fundamental objective, the creation of an Hispanic district, was achieved by the litigation.
 
 
 22
 The district court also concluded that the Scott and Chicago Urban League plaintiffs did not prevail. Id. at 259-60. Of course, we owe these decisions substantial deference. Shepard v. Sullivan, 898 F.2d 1267, 1271 (7th Cir.1990). In fact, the district court's determination must stand if any reasonable person could agree with it. See Washington v. Sherwin Real Estate Inc., 694 F.2d 1081, 1087 (7th Cir.1982).[11] But when a district court overlooks, either intentionally or inadvertently, relevant, binding precedent, its decision cannot stand. In defining "prevailing party," the district court relied exclusively upon Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Although Hensley is a central case interpreting the fee-shifting statutes, the Supreme Court has provided additional guidance. In particular, the Court in Texas State Teachers Association v. Garland Independent School District, 489 U.S. 782, 790, 109 S.Ct. 1486, 1492, 1492, 103 L.Ed.2d 866 (1989), rejected the so-called "central issue" test that several lower courts had adopted following Hensley. Under that test, a party was deemed to have prevailed only if he "prevailed on the central issue by acquiring the primary relief sought." Id. at 787, 109 S.Ct. at 1490 (citation omitted). In rejecting this formulation, the Court concluded that the degree of a plaintiff's success in relation to the other goals of the lawsuit was relevant only to the determination of the size of a reasonable fee, "not to eligibility for a fee award at all." Id. at 790, 109 S.Ct. at 1492. The court reiterated that success on any significant issue in litigation conferred prevailing party status. Id. at 791, 109 S.Ct. at 1493 (emphasis supplied).
 
 
 23
 The district court noted that the Scott plaintiffs intervened "for the limited purpose of addressing the configuration of a relatively small geographic area in the vicinity of East St. Louis, Illinois, contained in one of the pretrial Hastert plans." 794 F.Supp. at 259. The court went on to conclude that[p]laced in the context of arduous ... proceedings conducted to review only redistricting plans for the entire state, the Scott [plaintiffs'] fleeting presence to address their concerns regarding a tiny fraction of the state, their neutral stance regarding the merits of the principal issue to be litigated and their absence from the trial proceedings compel the conclusion that they do not constitute a statutory prevailing party
 
 
 24
 ....
 
 
 25
 Id. (internal quotation marks omitted). Certainly, the district court is correct that, in terms of the entire redistricting process, the Scott plaintiffs' claims were not particularly expansive. Under the "central issue" test, they perhaps would not be entitled to fees. But the Supreme Court has rejected that analysis. We find that the configuration of any of Illinois' 20 congressional districts was a significant issue in the litigation, and, after Garland, success on any such issue is enough to trigger an award of fees. Under this standard, the Scott plaintiffs undoubtedly prevailed. They urged that the congressional districts encompassing East St. Louis be configured in a particular way. They convinced the Hastert group to incorporate their proposed configuration into the Hastert master plan. When the district court adopted the Hastert plan, the Scott group accomplished everything it set out to achieve.[12] Thus, they too prevailed.
 
 
 26
 The result with respect to the Urban League plaintiffs is much less clear. In finding that the League plaintiffs did not prevail, the district court observed that these plaintiffs, like the Scott plaintiffs, focused their attention on a small portion of the state, in this case the four minority districts in Chicago. It further noted that while the Urban League plaintiffs' proposed map "closely tracked the Hastert configuration of the minority districts," they nonetheless "chose to proceed on the basis of their own separate map." 794 F.Supp. at 260.
 
 
 27
 As we noted in our discussion of the Scott plaintiffs, the fact that the Urban League group focused its attention on only a small part of the state does not preclude it from being declared a "prevailing party," see Hensley, 461 U.S. 424, 103 S.Ct. 1933. According to the district court's analysis, whether the Urban League plaintiffs prevailed, then, turns on the determination that they proceeded on the basis of their own separate map, rather than adopting the Hastert map.
 
 
 28
 The Chicago Urban League group entered the litigation in order to assure that--in the context of creating an Hispanic majority district--the strength of the three African-American majority districts not be diluted. This was the League group's purpose and, if they achieved it, they prevailed. In first bringing suit, they submitted a proposed map for these four districts (one Hispanic and three African-American). But as the litigation progressed the differences among the various parties' positions narrowed. In fact, before trial it became clear that both of the proposed state-wide maps (the ones proposed by the Rosebrook and Hastert groups), called for the creation of an Hispanic majority district. The Hispanic Nieves plaintiffs, their goal achieved, essentially dropped out of the litigation, and the African-American Nieves plaintiffs joined forces with the Urban League group. Thus, at a pre-trial hearing on October 3, 1991, an attorney for the African-American Nieves plaintiffs said that "the Nieves African-American plaintiffs and the Urban League are, have taken identical positions," and noted that "those two parties would merge into one" at trial. Later in that same pre-trial hearing, an attorney for the Urban League plaintiffs noted that they were negotiating with the Hastert group, and that if those negotiations proved successful, they might, at trial, "formally request that they adopt the Hastert amended map."
 
 
 29
 While no such motion was made during the trial, the negotiations continued, and on October 15, 1991, the Hastert plaintiffs filed with the court their third amended redistricting plan. That plan incorporated changes worked out with the African-American Nieves and Urban League plaintiffs. Following the trial, the African-American Nieves and Urban League plaintiffs filed a joint post-trial brief, and in it they called on the court to adopt the third amended Hastert map. The court ultimately did so. 777 F.Supp. at 662.
 
 
 30
 The substance of the debate at this point focused on the identity of the congressional district in which to locate Chicago's Second Ward. The Second Ward had historically been part of the First Congressional District, but the Rosebrook map would have moved it into the neighboring Seventh District. The Hastert map, however, left the Second Ward in the First District. In adopting the Hastert map, the position urged by the Urban League group--that Chicago's Second Ward remain part of the First Congressional District--prevailed.[13]
 
 
 31
 The failure of the Urban League plaintiffs formally to move the court to adopt the Hastert map, as their lawyer suggested in a pre-trial conference that they might, could conceivably constitute grounds for concluding that they did not adopt the Hastert map and therefore that they did not prevail. While the district court did not explain the basis of its determination, perhaps it relied on the failure of the Urban League plaintiffs to make such a motion in concluding that they proceeded "on the basis of their own separate map." 794 F.Supp. at 260. But such a conclusion strikes us as exceedingly formalistic, and is difficult to reconcile with the district court's conclusion that the Nieves plaintiffs--whose position merged with that of the Urban League group--did adopt the Hastert map. The issue before us is whether the district court abused its discretion in finding that the Nieves plaintiffs prevailed while the Urban League plaintiffs did not. We must bear clearly in mind that there can be no abuse of discretion if any rational person could agree with the conclusion of the district court. Admittedly, the task of the Nieves plaintiffs in achieving prevailing party status is easier since their predominant goal was to devise a district with an Hispanic voting majority. This is a clear goal that was clearly achieved. The Urban League plaintiffs, on the other hand, had the more complicated goal of achieving the Hispanic district while protecting against diluting the three pre-existing African-American districts. As the process unfolded, the League plaintiffs (in alliance with the African-American Nieves plaintiffs) also argued for the inclusion of the Second Ward (where Bobby Rush--a potential congressional candidate--was a resident[14]) in the First Congressional District. The Hayes-Collins group wanted to move the Second Ward (and Rush) into the Seventh District.
 
 
 32
 The League plaintiffs thus "prevailed" as to the creation of the Hispanic district, the preservation of three African-American districts and retention of the Second Ward in the First District. As noted, however, the Urban League plaintiffs did not move formally to themselves adopt the Hastert map, although they did call on the district court to adopt that map. This is surely an extraordinarily fine distinction, almost irrelevant to the substance of the redistricting process. The question is whether it is a distinction that might recommend itself to at least one rational decision-maker. After much thought we believe this distinction cannot pass even that test. We think therefore that the Urban League must also be considered a prevailing party.
 
 
 33
 That leaves the appeal by the Rosebrook plaintiffs. Because the Rosebrook plaintiffs did not timely petition the district court to reconsider its November 6 order, we do not have the benefit of the district court's determination whether they were a prevailing party.[15] But we nevertheless affirm the district court's November 6 order denying them fees, because we consider it entirely clear that they are not prevailing parties. In the end, the district court was faced with a choice between two maps, one put forward by the Hastert group (favoring Republicans) and another put forward by the Rosebrook plaintiffs (favoring Democrats). In its November 6 order, the court found that the Hastert map better satisfied the constitutional and statutory criteria, and thus adopted the Hastert plan. The Rosebrook group now argues that it was a substantial factor in eradicating conduct that violates the Voting Rights Act. See Maloney v. City of Marietta, 822 F.2d 1023 (11th Cir.1987). But redistricting cases like this one are unlike ordinary voting rights cases. As we have noted, in the redistricting context the touchstone for whether a party "prevails" is simply whether that party's map (or the map the party ultimately embraces) is ultimately adopted. We thus have relatively little difficulty concluding that the Rosebrook plaintiffs are not prevailing parties, and thus not entitled to attorneys' fees.
 
 
 34
 In sum, we agree with the district court that the Hastert and Nieves groups did prevail. But we disagree with its conclusions regarding the Scott group and the Urban League group. And we find that they too, were prevailing parties. As a result, the Hastert, Nieves, Scott and Urban League groups are prima facie entitled to fees. The Rosebrook plaintiffs, who did not prevail, are not entitled to fees.
 
 III.
 
 35
 Our analysis does not end here, however, since the district court went on to find that the existence of "special circumstances" precluded an award of fees even to prevailing parties. Although the fee shifting statutes commit fee awards to a district court's discretion, such discretion is, as previously noted, quite narrow once prevailing party status has been determined. See, e.g., New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 68 (1980). And we find that the reasons given by the district court for denying fees to prevailing parties in this case are inadequate.
 
 
 36
 The district court stated that "Congress' primary purpose in providing attorney's fees in civil rights litigation ... was 'to eliminate financial barriers to the vindication of constitutional rights...." 794 F.Supp. at 260 (quoting Seattle School District v. Washington, 633 F.2d 1338, 1348 (9th Cir.1980), aff'd, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982)). The court went on to note that the plaintiffs in this case "do not appear to be drawn from the ranks of the disempowered and financially disadvantaged citizenry that Congress had in mind when enacting [fee-shifting statutes]." Id. The district court is wrong on this point for two reasons. First, despite the fact that certain of the plaintiffs in this matter were elected officials, there is no evidence that they were particularly wealthy. Second, and more importantly, the Supreme Court has consistently held that a plaintiff's ability to pay for legal representation is not a special circumstance justifying denial of attorneys' fees. See, e.g., Venegas v. Mitchell, 495 U.S. 82, 87-88, 110 S.Ct. 1679, 1682-83, 109 L.Ed.2d 74 (1990); Blanchard v. Bergeron, 489 U.S. 87, 94, 109 S.Ct. 939, 944, 103 L.Ed.2d 67 (1989).
 
 
 37
 The district court also asserted that an award of fees would be unjust because "the plaintiffs merely shifted the legislative lobbying process that typically attends congressional redistricting to a federal judicial arena." 794 F.Supp. at 261. This might be true, but it is hardly a reason to deny attorneys' fees. It is surely regrettable that the Illinois General Assembly was unable to enact a new congressional district scheme and that the taxpayers of the State of Illinois must now pay for their dereliction. But such is the case whenever the political branches of government fail to vindicate important rights and the affected parties must seek a judicial hearing. There can be no doubt, moreover, that fee awards may issue against state and local governments. Hutto v. Finney, 437 U.S. 678, 694, 98 S.Ct. 2565, 2575, 57 L.Ed.2d 522 (1978). Thus, the State Board of Elections, as an agency of the state, may properly be held accountable for the prevailing parties' attorneys' fees.[16]
 
 
 38
 In reviewing these thorny fees matters in this redistricting case, we recognize the perhaps peculiar circumstances of redistricting cases generally. Here, all of the plaintiffs "contributed" to the final result in the sense that, by taking positions that were more or less, in whole or in part, "incorporated" into the accepted map, all parties arguably helped move the process forward toward its eventual culmination. On the other hand, there may be greater or lesser, formal or substantial, differences between the maps of the "winners" and the maps of the "losers." The Hastert, Nieves, Scott and Urban League plaintiffs have been declared the winners because exactly what they advocated has been accepted.
 
 
 39
 The State Board of Elections, the nominal defendant, has no interest in the eventual outcome except that there be an outcome which it can implement. Yet the State Board may be held liable for fees to the prevailing parties, whose status as such depends upon the relative success of their position in relation to the success of the other plaintiffs. These configurations of claim to liability and of success to failure are essentially unique to redistricting cases. In such cases, liability is usually imposed on a neutral (and nominal) defendant, and successful fees claims are awarded to the relatively successful plaintiffs. In this case, we are attempting to apply principles developed in a wide range of civil rights cases to the sui generis category of redistricting cases. As might be expected, these principles do not provide a close fit to this subject matter. It might be appropriate and helpful, by statute or otherwise, to develop a set of rules specifically governing attorneys' fees in redistricting cases, but that is not our task here.
 
 
 40
 For the foregoing reasons, we REVERSE the judgment of the district court insofar as it held that the Scott group and the Urban League group are not prevailing parties, and AFFIRM the district court's judgment that the Hastert and Nieves plaintiffs are prevailing parties. We also REVERSE the district court's determination that special circumstances exist so as to preclude the award of attorneys' fees to prevailing parties, and AFFIRM the court's determination that the Rosebrook group is not entitled to attorneys' fees. Finally, we REMAND the case with instructions to award reasonable attorneys' fees to the prevailing parties.
 
 
 41
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.
 
 
 42
 COFFEY, Circuit Judge, dissenting.
 
 
 43
 As I discuss infra at 1445-46, I reiterate my previous objections filed in the original panel opinion. See Hastert v. State Board of Elections, Nos. 92-1397 et al., slip op. at 21-24 (7th Cir. Dec. 17, 1993) (Coffey, J., dissenting). Additionally, I agree with the majority's determination in its amended opinion that the Rosebrook plaintiffs are not prevailing parties. In litigation of this nature, the various plaintiff's groups are competing against each other and in this case the court determined that the Hastert plan prevailed over the Rosebrook plan. Based on the lower court's selection of the Hastert plan, the Rosebrook plaintiffs cannot be viewed as prevailing parties.
 
 
 44
 As an initial matter, I agree with the majority that the November 6, 1991 district court opinion disposed of the attorneys' fees with the phrase "all parties to these consolidated cases bear their own costs." Hastert v. State Bd. of Elections, 777 F.Supp. 634, 662 (N.D.Ill.1991) (Hastert I ). I fail to understand the need for the majority's extensive criticism of the district court in regard to the attorneys' fees. In the lower court's subsequent opinion, Hastert v. Board of Elections, 794 F.Supp. 254 (N.D.Ill.1992) (Hastert II ), it treated the phrase "all parties to these consolidated cases bear their own costs" as resolving the attorneys' fees question. The three-judge district court was obviously in the best position to know whether it intended to deny attorneys' fees. Rather than criticizing the court for its holding, we should accept the lower court's interpretation of its own order and proceed to the merits of the instant appeal.
 
 
 45
 Secondly, I disagree with the majority's determination in the amended opinion to add the Chicago Urban League as a prevailing party.[1] The majority holds that the Urban League prevailed because (1) the League indicated prior to trial that it might adopt the Hastert plan, and (2) the League's goals (a Hispanic majority district and three African-American majority districts) were achieved through the Hastert plan. The district court ruled that the Urban League had not prevailed since it failed to adopt the Hastert plan and instead proceeded on its own separate map; the League's attorneys never followed through on the representation that they might "formally request that [the League] adopt the Hastert amended map." The majority originally agreed with the trial court but in the amended opinion changes course and reasons that such a distinction is too formalistic. I disagree. Rather than being formalistic, the district court properly refused to reward a plaintiff who was hedging its bets. Counsel for the Urban League was attempting to play both sides against the middle and accomplish the League's goals without committing to a position. By indicating before trial that it was contemplating adoption of the Hastert plan, but then never formally adopting that plan, the Urban League was able to reap the benefit of being "on board" the Hastert plan but if the district court ultimately adopted the Rosebrook plan, the Urban League attorneys had positioned themselves to present another argument that it prevailed based in part on the fact that it had never adopted the Hastert plan. A court of appeals should not fall prey to trial tactics of this nature.
 
 
 46
 The lower court ruled that the Urban League did not prevail and who is in a better position than the trial court to make that determination? I am unwilling to hold that the trial court abused its discretion on this matter, moreover, I am unaware of any case law warranting the reversal of the district court for "[a] decision on a fee award is left to the discretion of the district court in light of its superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.... A district court does not abuse its discretion ... if reasonable persons could differ over the view it adopts." McNabola v. Chicago Transit Authority, 10 F.3d 501, 518 (7th Cir.1993) (citations and quotation marks omitted) (emphasis added). As far as I know, McNabola is the law of the Seventh Circuit. The fact that the majority has changed its mind (from the first to the second opinion) about whether the Urban League prevailed is certainly evidence that "reasonable persons could differ" and mandates that the trial court did not abuse its discretion. Id. An appellate court should be extremely reluctant to hold that the knowledgeable and experienced members of the three-judge panel abused their discretion. Moreover, simply because the Nieves plaintiffs, who did prevail, had some goals in common with the League (creation of Hispanic majority district), does not warrant the conclusion that the League also prevailed. In this instance, the trial court made findings on the very same factual issues the panel majority raises, i.e., the role the Urban League played in creating the four minority congressional districts, and the trial court found that the League ultimately "chose to proceed on the basis of their own separate map." Hastert II, 794 F.Supp. at 260. This finding was not an abuse of discretion.
 
 
 47
 Regardless of which parties prevailed, I continue to adhere to the position enunciated in my prior dissenting opinion agreeing with the three-judge district court[2] that special circumstances mitigate against an award of attorneys' fees. Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). The district court found special circumstances render an award of attorneys' fees "unjust" in a case where (1) "the Board has played no active role in these proceedings and agree[d] to abide by the judgment of th[e] court," Hastert I, 777 F.Supp. at 639, (2) the litigation only involves plaintiffs' groups vying against one another and above all, (3) the redistricting should have occurred in the state legislative forum where attorneys' fees were unavailable. I remain of the opinion that this court should consider en banc whether the district court's interpretation of the fee statute is improper.
 
 
 48
 The amended majority opinion makes it even more clear that special circumstances make an award of fees in this type of case "unjust." Id. In deciding to confer prevailing party status on all but the Rosebrook plaintiffs and then proceeding to award the prevailing parties attorneys' fees, the majority obviously found it necessary to and did in fact expand the parameters of the standard for determining prevailing party status. A decision of this nature will only invite more challenges in redistricting litigation by encouraging special interest litigants to jump on the bandwagon (1) hire counsel, (2) draft a redistricting plan reflecting their own special concerns, (3) join in the statewide plan with the greatest chance of success, and (4) saddle the taxpayers with payment of their attorneys' fees under this newly created standard. Moreover, I am fearful that the majority opinion will accomplish nothing but to encourage groups like those before us to stonewall during the state legislative process (preventing the legislature from timely drafting a redistricting map) and then shift the battle to the federal courtroom where the plaintiffs' attorneys can receive a windfall of compensation for their services at the taxpayers' expense.[3]
 
 
 49
 Neither the State of Illinois nor any other governmental body should be responsible for the attorneys' fees of the prevailing parties in litigation involving a truly nominal defendant who played no active role in the proceedings. Attorneys' fees awards are especially uncalled for when the unmeritorious claims are based primarily on the litigants' partisan interests, i.e., drawing the most favorable redistricting boundaries, as opposed to protection of recognized constitutional rights of aggrieved parties. As I stated in my prior dissent, fee shifting in civil rights litigation is not intended to result in a "windfall" for attorneys, yet that is precisely what occurred in this instance. Farrar v. Hobby, --- U.S. ----, ----, 113 S.Ct. 566, 575, 121 L.Ed.2d 494 (1992).
 
 
 
 *
 On consideration of the petition for rehearing with suggestion for rehearing en banc filed bythe defendants-appellees, a vote of the active members of the court was requested, and a majority of the judges in active service have voted to deny rehearing en banc. Chief Judge Posner, Judge Coffey and Judge Manion voted to grant rehearing en banc. Judge Flaum and Judge Kanne did not participate in the consideration of the suggestion for rehearing en banc
 On consideration of the petitions for rehearing with suggestion for rehearing en banc filed by the plaintiffs-appellants, the panel has voted to grant in part the petitions for rehearing, and herein issues its amended opinion. No judge in active service has requested a vote on the suggestion for rehearing en banc. Judge Flaum and Judge Kanne did not participate in the consideration of the suggestion for rehearing en banc.
 
 
 [1]
 Article 4, Sec. 3(b) of the Illinois Constitution states, "In the year following each Federal decennial census year, the General Assembly by law shall redistrict the Legislative and Representative Districts."
 
 
 [2]
 Redistricting plans are within the veto power of an Illinois governor. See Williams v. Kerner, 30 Ill.2d 11, 195 N.E.2d 680 (1964)
 
 
 [3]
 Several individuals and organizations were permitted to intervene in the consolidated action, including Johnny Scott and Ben Howard (the "Scott" plaintiffs or group), acting individually and as representatives of local chapters of the National Association for the Advancement of Colored People
 
 
 [4]
 The Rosebrook plaintiffs asked the court to amend its judgment to state that the Hispanic majority district proposed by the Hastert plaintiffs, and later adopted by the court, was substantially similar to the Hispanic majority district proposed by the Rosebrook plaintiffs. The apparent purpose of this motion was to buttress the Rosebrook plaintiffs' claim that they were prevailing parties and thus entitled to attorneys' fees
 
 
 [5]
 On February 27, 1992, the Collins plaintiffs moved the district court to rule on its motion for reconsideration of the denial of fees. The court has yet to dispose of this motion
 
 
 [6]
 Accordingly, the Rosebrook plaintiffs' notice of appeal is ineffective to the extent it seeks review of the merits of the district court's redistricting decision
 
 
 [7]
 Hereafter, when we use the phrases "Rule 54(d) costs" or "routine Rule 54(d) costs" we will be referring to the set of costs described by 28 U.S.C. Sec. 1920
 
 
 [8]
 Actually, these groups filed a motion to alter or amend judgment and a petition for attorneys' fees pursuant to section 1988. Ordinarily, such a petition for attorneys' fees would not be a proper Rule 59(e) motion. White v. New Hampshire Dep't of Employment Sec., 455 U.S. 445, 451, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982). But because we have adopted the district court's view that it considered and denied attorneys' fees in its November 6 opinion, the later petition for such fees must be construed as a Rule 59(e) motion. Under our cases, all substantive motions served within ten days of the entry of judgment are treated as filed under Rule 59(e). Charles v. Daley, 799 F.2d 343, 347 (7th Cir.1986). The petition for attorneys' fees was filed within ten days of the November 6 entry of judgment and it was substantive in the sense that it asked the district court to reverse its earlier denial of fees
 
 
 [9]
 In addition to appealing to this court, the Hastert and Nieves plaintiffs also moved the district court to reconsider its January 17 decision. Since the district court has not resolved these motions, one might think that their appeals are premature. But successive requests to alter or amend judgment, which are all these motions amount to, do not toll the time for appeal, United States Equal Employment Opportunity Comm'n. v. Gurnee Inns, Inc., 956 F.2d 146, 148 (7th Cir.1992), nor do they affect the finality of the judgment. Charles v. Daley, 799 F.2d 343, 347 (7th Cir.1986)
 
 
 [10]
 Because Secs. 1973l(e) and 1988 contain nearly identical language and are driven by similar congressional purposes, we construe them similarly. Cf. Hensley v. Eckerhart, 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983)
 
 
 [11]
 Apart from its own possible inadequacies, this panel has had difficulty reaching final conclusions on some of the issues presented because (1) the district court offered few reasons for its results and (2) the parties did not initially spell out their arguments in the detail which they furnished at the rehearing stage. We have had to spend many hours searching for clues in the record
 
 
 [12]
 It is of no consequence that the Scott group achieved its goals without litigating to the bitter end. Indeed, the Supreme Court has held that a party who achieves success by settling is entitled to attorney's fees. Maher v. Gagne, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980). All that is important is for the party to obtain the "substance of what [it] sought." Hewitt v. Helms, 482 U.S. 755, 761, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987). The Scott plaintiffs undeniably did so
 
 
 [13]
 Hon. Bobby Rush, alderman from the Second Ward, was in 1992 elected to Congress to represent the First District
 
 
 [14]
 While the Constitution requires only that a representative be an "Inhabitant of that State in which he shall be chosen," U.S. Const., Art. I, Sec. 2, candidates who reside in the district they are seeking to represent surely have an electoral advantage over those who live in other districts
 
 
 [15]
 We know only that when the Rosebrook plaintiffs moved the district court to reconsider its December 27 decision to deny their Rule 59(e) motion for reconsideration as untimely filed, the district court denied the motion as moot, in light of its January 17 order. But we do not know for certain whether the district court considered the motion moot because, in its view, the Rosebrook plaintiffs did not prevail, or rather because it held in its January 17 order that even the prevailing parties were not entitled to attorneys' fees
 
 
 [16]
 It is of no consequence that the State Board of Elections played no active role in the proceedings and agreed to enforce whatever plan the district court adopted, since fees may be taxed even against entities whose role is limited to enforcement of regulations they played no role in promulgating. Crosby v. Bowling, 683 F.2d 1068, 1073 (7th Cir.1982). Nor is the Board's putative "good faith" a special circumstance justifying a refusal to award fees. Lampher v. Zagel, 755 F.2d 99, 104 (7th Cir.1985)
 
 
 [1]
 In the original opinion, the majority ruled that the Urban League was not a prevailing party because "the Chicago Urban League plaintiffs insisted on their own map. They did not get it. On an issue like this, where either result would have been sustainable, the district court is in the best position to determine whether fees are appropriate. Here the district court did not abuse its discretion." Hastert, slip op. at 16-17 (7th Cir. Dec. 17, 1993)
 
 
 [2]
 Hastert II, 794 F.Supp. at 260-61
 
 
 [3]
 The majority suggests that the legislature's inability to draft a redistricting plan was due in part to the fact there was a Republican governor and a Democratic legislature. This attempt at assigning blame is in error because the legislature, which was controlled by one party, never even passed or voted on a plan. Thus, the Republican governor was not called upon to sign any legislation. The failure to pass redistricting legislation was likely attributable to the various plaintiff groups vying against one another. The fact that Illinois failed to pass redistricting legislation following the census of 1970 and 1980 is of little consequence for in those years, one party controlled the house and the other controlled the senate