Fortis MORSE, Kenneth Curtis
Bartholomew, and Kimberly
J. Enderson, Plaintiffs,

v.

REPUBLICAN PARTY OF VIRGINIA,
and Albemarle County Republican
Committee, Defendants.

Civil Action No. 94–0025–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

July 7, 1997.

George Alfred Rutherglen, Charlottesville, VA, Daniel R. Ortiz, University School of Law, Charlottesville, VA, Pamela S. Karlan, Charlottesville, VA, Eben Moglen, New York City, for Fortis Morse, Kenneth Curtis Bartholomew, Kimberly J. Enderson.

Joseph Robert Brame, III, McGuire, Woods, Battle & Boothe, LLP, Charlottesville, VA, Earle Duncan Getchell, Jr., McGuire, Woods, Battle & Boothe, Richmond, VA, Donald W. Lemons, Durrette, Irvin, Lemons & Fenderson, P.C., Richmond, VA, Patrick M. McSweeney, Richmond, VA, Daniel A. Carrell, Carrell & Rice, Richmond, VA, for Republican Party of Virginia, Albemarle County republican Committee.

Before WIDENER, Circuit Judge, SPENCER, District Judge, and MICHAEL, Senior District Judge.

## MEMORANDUM OPINION

Currently before the court is plaintiffs' November 25, 1996 Motion for Award of Attorney's Fees and Costs. Defendants challenge the awarding of attorneys' fees, contending that (1) the legislative history of § 1988 demonstrates that Congress did not intend for attorneys' fees to be awarded against individual actors, and (2) special circumstances justify denying plaintiff any award of attorneys' fees. In the alternative, defendants argue that the claimed fees and costs should be reduced substantially. We hold that plaintiffs are entitled to an award of attorneys' fees and costs, with some modification to the amounts demanded by plaintiffs.

### I. Congressional Intent and Special Circumstances

Plaintiffs seek an award of attorneys' fees pursuant to 42 U.S.C. § 1973*l* (e) of the Voting Rights Act Amendments of 1975. Section § 1973*l* (e) states that "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Because the standards governing the award of attorneys' fees in cases proceeding under § 1973*l* (e) are identical to those proceeding under § 1988, see *Hensley v. Eckerhart*, 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983) (noting that the standards set forth in *Hensley* "are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing plaintiff' "); *Hanrahan v. Hampton*, 446 U.S. 754, 758 n. 4, 100 S.Ct. 1987, 1989 n. 4, 64 L.Ed.2d 670 (1980) (noting that "[t]he provision for counsel fees in § 1988 was patterned upon the attorney's fee

provision contained in Titles II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–3(b) and 2000e–5(k), and § 402 of the Voting Rights Act Amendments of 1975, 42 U.S.C. § 1973*l* (e)"), cases decided under § 1988 are instructive in determining whether fees should be awarded pursuant to § 1973*l* (e).

### 1. *Congressional Intent*

■ Initially, we dispense with defendants' argument that Congress did not intend to permit the awarding of fees against political parties. Defendants argue that "[t]he legislative history of § 1988 demonstrates that Congress intended the act to allow awards against governmental units, and not agents who act on its behalf." Defendants' Response to Plaintiffs' Motion for an Award of Attorneys' Fees and Costs at 26, *Morse v. Republican Party of Va.*, (W.D.Va. Jan. 15, 1997) (No. 94–0025–C) [hereinafter Defendant's Response] (citing *Wisconsin Socialist Workers 1976 Campaign Comm. v. McCann*, 460 F.Supp. 1054, 1057 (D.Wis.1978)). In effect, defendants argue that they should not be liable for attorneys' fees because political parties are akin to state officials. The legislative history of § 1988 recognizes that Congress "intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government." S.Rep. No. 1011, 94th Cong., 2d Sess. 5 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5913 (footnotes omitted). The legislative history of the Voting Rights Act Amendments contains similar language. *See* S.Rep. No. 295, 94th Cong., 1st Sess. 41 (1975), *reprinted in* 1975 U.S.S.C.A.N. 774, 808. The Republican Party of Virginia and the Albemarle County Republican Committee are analogous to state agencies rather than individual state actors: Plaintiffs seek fees from the political parties, not the party officials in their individual capacities. As such, defendants may be held liable for a prevailing plaintiff's attorneys' fees under § 1973*l* (e) barring special circumstances that would make such an award unjust.

### 2. *Special Circumstances*

■ Although the awarding of attorneys' fees under § 1973*l* (e) is discretionary, "[a] party seeking to enforce the rights protected by [the Voting Rights Act], if successful, 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' " S.Rep. No. 295 at 40, *reprinted in* 1975 U.S.S.C.A.N. at 807 (citing *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966–67, 19 L.Ed.2d 1263 (1968)); *see also Maloney v. City of Marietta*, 822 F.2d 1023, 1025 (11th Cir.1987) (noting that under § 1973*l* (e), "a prevailing plaintiff ordinarily is entitled to a fee award 'as a matter of course' absent special circumstances that would render such an award unjust"); *Donnell v. United States*, 682 F.2d 240, 245 (D.C.Cir.1982) (finding that "the legislative history [of 1973*l* (e) ] makes clear that a prevailing party usually should recover fees"); *cf. Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 942 n. 1, 103 L.Ed.2d 67, (1989) (noting that a prevailing party in a § 1988 suit is ordinarily entitled to attorneys' fees); *Spell v. McDaniel*, 852 F.2d 762, 765 (4th Cir.1988) (same). Defendants urge this court to deny plaintiffs an award of attorneys' fees because special circumstances exist to make such an award unjust.

■ "[T]he special circumstances exception is a judicially created concept, not mentioned in any of the fee award statutes, and therefore 'should be narrowly construed so as not to interfere with the congressional purpose in passing such statutes.' " *Maloney*, 822 F.2d at 1027 (quoting *Martin v. Heckler*, 773 F.2d 1145, 1149–50 (11th Cir. 1985)). In determining whether special circumstances exist, a court may consider the totality of circumstances so that even though each justification for the denial of fees may not, on its own, support a finding of special circumstances, the sum total of the justifications may warrant a denial of fees. *See Thorsted v. Munro*, 75 F.3d 454, 456 (9th Cir.1996). Defendants argue that special circumstances justifying the denial of attorneys' fees exist because (1) defendants acted in good faith; (2) an award of fees will not promote access to the courts; and (3) an

award of fees will not serve to deter future constitutional violations. That notwithstanding, the factors identified by defendants in the instant case, even when considered together, do not rise to the level of special circumstances such that plaintiffs should be denied an award of attorneys' fees.

■ This court begins from the premise that "good faith is not a special circumstance that would render the award of fees unjust." *Bills v. Hodges*, 628 F.2d 844, 847 (4th Cir. 1980) (citing *Tillman v. Wheaton–Haven Recreation Ass'n*, 517 F.2d 1141, 1147 (4th Cir. 1975)) (claim for fees under § 1988); *see also Lampher v. Zagel*, 755 F.2d 99, 104 (7th Cir.1985) (quoting *Harrington v. DeVito*, 656 F.2d 264, 268 (7th Cir.1981)) (same); *O'Sullivan v. Brier (In re Kansas Congressional Dists. Reapportionment Cases)*, 745 F.2d 610, 613 (10th Cir.1984) (citing *Love v. Mayor of Cheyenne*, 620 F.2d 235, 236 (10th Cir.1980)) (same); *Nadeau v. Helgemoe*, 581 F.2d 275, 280 (1st Cir.1978) (same). *But see Teitelbaum v. Sorenson*, 648 F.2d 1248, 1250 & n. 1 (9th Cir.1981) (noting that "good faith is one factor of several that a court may consider" in determining whether an award of fees is appropriate, but recognizing that six other circuits—including the Fourth Circuit—have held otherwise).[1] As the Fifth Circuit noted, the recognition that good faith is not a controlling factor

> conforms to the policy underlying the award of attorney's fees in civil rights cases. Attorney's fees are not designed merely to penalized defendants, but to encourage injured individuals to seek judicial relief. From this latter policy perspective it makes no difference whether plaintiff's suit yields favorable out of court results because a good faith defendant is brought to understand the illegality of his conduct and alters his behavior or because an unrepentant defendant grudgingly signs a consent decree to avoid continued litigation expenses in a lost cause. The key issue is

the provocative role of the plaintiff's lawsuit, not the motivations of the defendant.

*Nadeau*, 581 F.2d at 280 (citations omitted). For these reasons, we find that defendants' good faith is not at issue in a determination of special circumstances.

■ Defendants also argue that plaintiffs should not be awarded attorneys' fees because an award of fees will not promote access to the courts. "The principal congressional purpose behind the enactment of the attorneys' fees provision of §§ 1973*l* (e) and 1988 is reflected in Congress' observation that '[i]n many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer.' " *Hastert v. State Bd. of Elections*, 794 F.Supp. 254, 260 (N.D.Ill.1992) (quoting S. Rep. 1011 at 2, *reprinted in* 1976 U.S.C.C.A.N. at 5910), *aff'd in part, rev'd in part on other grounds sub nom., Hastert v. Illinois State Bd. of Election Comm'rs*, 28 F.3d 1430 (7th Cir.1994). As such, "fee awards are often 'an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies' embodied in civil rights legislation." *Id.* (quoting S. Rep. 1011 at 2, *reprinted in* 1976 U.S.C.C.A.N. at 5910). Absent the possibility of obtaining attorneys' fees, it is unlikely that plaintiffs would have secured counsel willing to undertake the difficult and time-consuming task of litigating this case. As a result, contrary to defendants' assertions, an award of fees would serve to vindicate Congress's purpose in enacting attorneys' fee provisions; namely, promoting access to the courts.

■ Finally, defendants argue that an award of fees will not serve to deter future constitutional violations by defendants because a political party "is not an entity or agent of government, and in exercising its First Amendment rights cannot ordinarily violate the Constitution." Defendants' Re-

---

1. Defendants contend that the Fourth Circuit's decision in *Chastang v. Flynn & Emrich Co.*, 541 F.2d 1040, 1045 (4th Cir.1976), permits this court to find that good faith can be considered with other factors in determining whether special circumstances exist, but we find that the language in *Chastang* is far from clear. More-

over, one panel cannot overrule the decision of another panel, *see Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir.1996), and to interpret *Chastang* in the way that defendants would have us interpret the decision would effectively be to overrule *Tillman*.

sponse at 25. In this respect, defendants appear to retreat once again to their argument that by requiring registration fees the party merely was exercising its First Amendment rights. *See id.* (noting that "the Party exists solely for the expression of First Amendment political views" and that "[a]warding fees would have a chilling effect on the associational interests and expression of views by the Party and similar private political associations. There is no public interest in deterring political expression."). In the instant case, the Supreme Court found that the First Amendment did not protect defendants' conduct. *See Morse v. Republican Party of Va.,* — U.S. —, — – —, 116 S.Ct. 1186, 1210–11, 134 L.Ed.2d 347 (1996). That being the case, we cannot find defendants' unprotected conduct to be such that a denial of fees is warranted. As we noted *supra*, "[t]he key issue is the provocative role of the plaintiff's lawsuit." *Nadeau,* 581 F.2d at 280. Simply because defendants have less opportunity to violate the Voting Rights Act does not justify denying plaintiffs attorneys' fees.

Accordingly, for the aforementioned reasons, we find that plaintiffs are entitled to an award of reasonable attorneys' fees pursuant to § 1973*l* (e).

## II. *Attorneys' Fees*

Having determined that plaintiffs are entitled attorneys' fees, it now falls to this court to determine the amount. Defendants seek to reduce substantially any fees awarded by this court, arguing that (1) fees for time spent prior to the appeal to the Supreme Court should be reduced by 50% because plaintiffs are not entitled to an award of fees based on work relating to plaintiffs' claim against defendant the Oliver North for U.S. Senate Committee, Inc. ("the North Committee"); (2) plaintiffs' hourly rates are excessive and beyond the relevant market rate for Charlottesville, Virginia; and (3) plaintiffs failed to exercise proper billing judgment, thus charging excessive hours and expenses.[2]

The court will address each argument in turn.

### A. *Work Relating to Claim Against the North Committee*

■ In 1994, Oliver North sought to become Virginia's Republican Party candidate for United States Senator. The selection of the candidate was to be accomplished at a state nominating convention, the delegates to which would be selected at the local level. Plaintiff's complaint originally charged that the North Committee violated 42 U.S.C. § 1973i(c) when it offered to pay delegates' registration fees if the delegates committed to voting to nominate North as the Republican candidate. *See* Complaint ¶ 50. On June 8, 1994, plaintiffs voluntarily dismissed their claim against the North Committee pursuant to Rule 41(a)(1)(i) of the Federal Rules of Civil Procedure when it became clear after the state Republican convention that their claim was moot. Defendants argue that they should not be charged for any fees relating to plaintiffs' claim against the North Committee. Defendants contend that because plaintiffs have failed to identify or reduce their claimed fees for work relating to plaintiffs' claim against the North Committee, all fees generated prior to plaintiffs' appeal to the Supreme Court should be reduced by half.

■ It is well established that a prevailing party may not charge its opponent with attorneys' fees incurred in the unsuccessful pursuit of victory on an unrelated claim. *See Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940–41; *Fair Housing Council v. Landow,* 999 F.2d 92, 97 (4th Cir.1993). Moreover, the Fourth Circuit has recognized that " 'the burden of showing which hours are recoverable for work on the successful claims will of course rest with the fee applicant.' " *Landow,* 999 F.2d at 97 (quoting *Buffington v. Baltimore County,* 913 F.2d 113, 128 (4th Cir.1990)). Nevertheless, a plaintiff's complaint "cannot be viewed as a series of dis-

---

**2.** Defendants also argue separately that the hours worked were excessive and not justified by the complexity of the case or the skill of plaintiffs' attorneys. In this regard, we believe defendants' argument is more properly resolved in a determination of defendants' third set of objections; namely, whether plaintiffs' attorneys exercised appropriate billing judgment. *See infra* part II.C.

crete claims" if the claims "involve a common core of facts or [are] based on related legal theories." *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. Rather, when the claims are interrelated, a court should instead "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* Accordingly, the issue in the instant case becomes whether the claim asserted against the North Committee was related to those claims that were asserted against the Republican Party of Virginia and the Albemarle County Republican Committee.

Plaintiffs argue that their claim against the North Committee arose out of the same set of operative facts. In addition, plaintiffs contend that all defendants asserted similar legal arguments as to the application of the Voting Rights Act to political parties' nominating conventions. Finally, plaintiffs assert that "[e]ven if the work on this claim could be separated from the rest of the case, any time spent by plaintiffs' attorney on this aspect of the case was minimal." Memorandum in Support of Plaintiffs' Motion for Award of Attorney's Fees and Costs at 4 (*Morse*) (No. 94–0025) (W.D.Va. Nov. 25, 1996). Defendants argue that plaintiffs' claim against the North Committee "arose out of distinct facts brought against a different defendant under a separate provision of law."

In their complaint, plaintiffs alleged that the North Committee violated § 1973i(c) by paying or offering to pay the registration fees of those delegates who would support North for the nomination of Republican candidate for United States Senate. The balance of plaintiffs' complaint under the Voters Rights Act alleged that the Republican Party violated §§ 1973c and 1973h(a) by charging a registration fee to attend the nominating convention. Although plaintiffs' claims arose to some degree out of the same set of operative facts, a review of plaintiffs' complaint and the papers filed in this case persuades the court that defendants' objection has merit: the propriety of paying an individual's registration fee to attend a nominating convention in exchange for the individual's vote is an issue separate and apart from the question of whether the imposition of a registration fee on nominating convention participants violates the Voting Rights Act. In addition, even though the North Committee argued that paying delegates' convention fees did not fall under § 11 of the Voting Rights Act, this defense is separate and apart from the other defendants' contention that the imposition of convention attendance fees was not subject to the preclearance requirements of § 5. *Compare* Memorandum of Defendant Oliver North for U.S. Senate Committee, Inc. at 3–8, *Morse* (No. 94–0025–C) (May 16, 1994) *with* The Republican Party of Virginia's Memorandum of Law Opposing Plaintiffs' Motion for a Preliminary Injunction at 2–8, *Morse* (No. 94–0025–C) (May 16, 1994). Accordingly, plaintiffs are not entitled to recover fees for work performed on behalf of their claim against the North Committee.

■ Despite being on notice that defendants seek to reduce their pre-appeal fees by one-half, plaintiffs have failed to distinguish between those hours that were spent on their claim against the North Committee, and those hours that were spent litigating their claims against the other defendants. Nevertheless, this court is unpersuaded that a fifty percent reduction in fees is appropriate. Instead, cognizant of the fact that plaintiffs asserted a total of five claims in their complaint, only one of which was asserted against the North Committee, we will reduce by twenty percent plaintiffs' fees for work performed prior to the appeal of this case to the Supreme Court.

### B. *Plaintiffs' Attorneys' Hourly Rates*

■ In order to determine an appropriate attorneys' fee, the court must first establish "the lodestar," a sum calculated by multiplying an attorney's reasonable hourly rate by the number of hours that should reasonably have been expended in the prosecution or defense of a claim. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939; *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 174 (4th Cir.1994). As a rule, the hourly fee of an attorney should be based on the market rate for legal services in the community in which the court sits. *National Wildlife Fed'n v. Hanson,* 859 F.2d 313, 317 (4th Cir.1988);

*Rosenberger v. Rector of the Univ. of Va.,* No. 91–0036–C 1996 WL 537859, at *4 (W.D.Va. Sept. 17, 1996). In the instant case, plaintiffs' attorneys seek compensation at rates higher than the prevailing market rate in Charlottesville, Virginia. Defendants argue that the plaintiffs' attorneys' rates are excessive and should be reduced.

■ In this litigation, plaintiffs were represented by four attorneys, three of whom were professors at the University of Virginia School of Law, the fourth being a visiting law professor at the Harvard Law School.[3] Prior to resolving defendants' objections, the court will review the credentials of plaintiffs' attorneys.

### 1. *Plaintiffs' Attorneys*
#### a. *Professor Pamela Karlan*

Ms. Karlan's curriculum vitae indicates that she is currently a full professor at the University of Virginia. During her tenure at the University, Ms. Karlan has been a visiting professor at Stanford, Harvard, Yale, and New York University. Ms. Karlan was graduated from Yale University and the Yale Law School. Prior to becoming a professor, she was a law clerk to Judge Abraham D. Sofaer and Justice Harry A. Blackman, in addition to having served two years as assistant counsel to the NAACP Legal Defense and Educational Fund, Inc. Over the course of her career, Ms. Karlan has written numerous articles on voting rights, and has enjoyed extensive litigation experience before the United States Supreme Court and various federal and state courts. Her affidavit represents that her hourly rate is $325.00 and that she previously has received $338.00 per hour for her participation in Supreme Court litigation.

#### b. *Professor George Rutherglen*

Mr. Rutherglen's curriculum vitae indicates that he is currently a full professor at the University of Virginia. Mr. Rutherglen was graduated from the University of California at Berkeley and the Boalt Hall School of Law. Prior to becoming a professor, he

was a law clerk to Judge J. Clifford Wallace and Justices William O. Douglas and John Paul Stevens. Over the course of his career, Mr. Rutherglen has authored numerous books and articles, and has participated in several appellate cases before the United States Supreme Court and the Fourth Circuit Court of Appeals. His affidavit represents that his hourly rates range from $200.00 to $300.00, and that he is currently seeking compensation in this litigation at an hourly rate of $275.00.

#### c. *Professor Daniel R. Ortiz*

Mr. Ortiz's curriculum vitae indicates that he is currently a full professor at the University of Virginia. During his tenure at the University, Mr. Ortiz has been a visiting professor at the University of Southern California. Mr. Ortiz was graduated from Yale University, Magdalen College at Oxford University, and the Yale Law School. Prior to becoming a professor, he was a law clerk to then–Judge Stephen G. Breyer and Justice Lewis F. Powell. Over the course of his career, Mr. Ortiz has authored numerous articles, some of which relate to voting. In addition, Mr. Ortiz has participated in several appellate cases before the Fourth and Ninth Circuit Courts of Appeals. His affidavit represents that his hourly rate is $275.00.

#### d. *Professor Eben Moglen*

Mr. Moglen's curriculum vitae indicates that he is currently a full professor at Columbia Law School. During his tenure at the Columbia, Mr. Moglen has been a visiting professor at Harvard, the University of Virginia, and Tel–Aviv University. Mr. Moglen was graduated from Swarthmore College and Yale University. Prior to becoming a professor, he was a law clerk to Judge Edward Weinfeld and Justice Thurgood Marshall. Over the course of his career, Mr. Moglen has authored numerous books and articles, and has participated in several appellate cases before the United States Supreme Court, some of which involved voting issues. His affidavit represents that his current hourly rate is $400.00, but he is currently

---

**3.** For part of the time during this litigation, one of the University of Virginia professors was also

a visiting professor at Harvard.

seeking compensation in this litigation at an hourly rate of $275.00.

### 2. A Reasonable Hourly Rate

█ A fee applicant "bears the burden of establishing the reasonableness of the hourly rates requested. Specifically, the applicant must produce specific evidence of the 'prevailing market rates in the relevant community' for the type of work for which he seeks an award." *Spell*, 824 F.2d at 1402 (citing, in the context of a claim for fees in a § 1988 dispute, *Blum v. Stenson*, 465 U.S. 886, 895–96 & n. 11, 104 S.Ct. 1541, 1547–48 & n. 11, 79 L.Ed.2d 891 (1984); *National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1325 (D.C.Cir.1982)). In their motion for an awarding of attorneys' fees, plaintiffs essentially argue that the relevant market for Voting Rights Acts cases is a national, as opposed to a local, market. Defendants argue that plaintiffs are only entitled to hourly rates that are customary in Charlottesville, Virginia. Moreover, defendants contend that plaintiffs' attorneys lack the experience necessary to justify the higher rates. Accordingly, defendants seek to reduce the hourly rates claimed in the instant case from $325.00 to $200.00 for Ms. Karlan; from $275.00 to $175.00 for Messrs. Rutherglen and Ortiz; and from $275.00 to $125.00 for Mr. Moglen. Plaintiffs respond that the complexity of the voting rights issues forced plaintiffs to look beyond the Charlottesville bar for their attorneys, and that, as a result, the regional or national rates charged by plaintiffs' attorneys are appropriate.

As noted *supra*, "the community in which the court sits is the first place to look to in evaluating the prevailing market rate." *Rum Creek Coal*, 31 F.3d at 179, *see also National Wildlife Fed'n*, 859 F.2d at 317. Nevertheless, the Fourth Circuit has recognized that " '[t]he complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally.' " *National Wildlife Fed'n*, 859 F.2d at 317

(quoting *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir.1982)). Plaintiffs have not provided any direct evidence to explain why members of the local bar would have been unable to take plaintiffs' case at a correspondingly lower rate;[4] there is no suggestion that plaintiffs unsuccessfully sought to obtain local attorneys to represent them in this litigation. *Compare Rosenberger*, 1996 WL 537859, at *4 (noting that plaintiff had been unable to locate any other qualified counsel in the Charlottesville area). Instead, plaintiffs simply argue that "the specialized nature of the voting rights bar" is such that no local attorney existed to represent plaintiff. In support of their argument, plaintiffs put great weight on the failure of *defendants* to establish that other Charlottesville attorneys could have represented plaintiffs in the case at bar. *See* Reply in Support of Plaintiffs' Motion for Award of Attorneys' Fees and Costs at 11, *Morse* (No. 94–0025–C) [hereinafter Plaintiffs' Reply]. Plaintiffs have failed rebut the presumption that local rates apply *for* work that their attorneys performed in this case.

Initially, this court notes that defendants' failure to establish that other local attorneys could have represented plaintiffs is irrelevant: the burden is not on defendants to establish the reasonableness of the hourly rate requested. *See Spell v. McDaniel*, 616 F.Supp. 1069, 1101 (E.D.N.C.1985) ("Once the fee applicant has provided support for the requested rate, the burden falls to the losing party to go forward with evidence that the rate is erroneous."), *aff'd in part, vacated in part on other grounds*, 824 F.2d 1380 (4th Cir.1987). In fact, any representation by defendants that local attorneys would willingly have represented plaintiffs in the case at bar would be "only speculation ... and after the fact." *See Rosenberger*, 1996 WL 537859, at *4. Plaintiff alone has the burden of rebutting the presumption that local rates apply by bringing forward evidence that would justify the expenditure of higher rates.

---

4. Although three of plaintiffs' attorneys are law professors at the University of Virginia in Charlottesville, their practices are nationally oriented. These attorneys demand compensation at hourly rates that are higher than those traditionally charged by Charlottesville attorneys with local practices. For the purposes of this opinion, when the court refers to "local attorneys" it is not including plaintiffs' attorneys within this group.

In the instant case, plaintiffs have failed to rebut the presumption that the hourly fee of an attorney should be derived from the community in which the court sits. Although plaintiffs attempt to secure higher fees on the basis of fees charged by other attorneys in similar cases, none of these attorneys are in the Charlottesville market. Although this court recognizes that because of the complexity of voting rights cases, a "voting rights bar" has developed, plaintiffs have introduced no evidence to suggest that a local attorney could not have provided plaintiffs with competent representation. Instead, the only evidence before the court as to the local market and prevailing local rates is the affidavit of John W. Zunka, Esq., a local attorney. Mr. Zunka states that in complex matters such as Voting Rights Act litigation, a local attorney "could reasonably charge and receive rates ... of between $160 and $225 per hour." Defendants' Response, Ex. 1, ¶ 7 (Jan. 15, 1997 Declaration of John W. Zunka). Based on Mr. Zunka's opinion and the credentials of plaintiffs' attorneys, this court will award Ms. Karlan fees at a rate of $225 per hour, and fees to Messrs. Rutherglen and Ortiz at a rate of $175 per hour.

■ Defendants argue that Mr. Moglen is not entitled to compensation at a rate equal to that of plaintiffs' other attorneys because "he has no special expertise" in voting rights law. *See* Defendants' Response at 18. Moreover, defendants criticize plaintiffs' retention of Mr. Moglen because "[h]is remote location add[ed] an extra burden of effort and expenses for coordination of efforts." *Id.* Plaintiffs do not address the issue of Mr. Moglen's experience, and instead explain that at the time Mr. Moglen performed the bulk of his work, he and Ms. Karlan were visiting professors at Harvard, thus minimizing any extra burden. As his credentials indicate, *see supra* II.B.1.d, although Mr. Moglen may not be an expert in voting rights matters, his experience with regard to appellate matters is evident and justifies an hourly fee equal to that of Messrs. Rutherglen and Ortiz. Accordingly, Mr. Moglen will be awarded fees at a rate of $175 per hour. The court will address *infra* defendants' second objection—whether the employment of Mr. Moglen constituted overstaffing, thus demonstrating a lack of billing judgment—in the court's determination of whether the hours claimed are reasonable.

### C. Reasonable Hours Expended

■ As part of the lodestar calculation, a court must determine the number of hours that should reasonably have been expended in the prosecution or defense of a claim. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939; *Rum Creek Coal*, 31 F.3d at 174. In calculating the reasonable number of hours, a court should consider the twelve factors enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), including:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Rum Creek Coal*, 31 F.3d at 175 (citing *Johnson*, 488 F.2d at 717–19).

Plaintiffs seek compensation for a total of 519.4 hours of work. Specifically, Ms. Karlan and Messrs. Rutherglen, Ortiz, and Moglen have billed 229.4 hours, 144.2 hours, 85.7 hours, and 60.1 hours, respectively.[5] Defen-

---

5. These totals represent the following:

| Karlan | | 229.1 | hours for work performed prior November 25, 1996 |
|---|---|---|---|
| | × | 3.8 | hours for work performed after November 25, 1996 |
| | | (3.5) | hours for travel on July 14, 1994, which plaintiffs concede was improperly billed at the full rate. |
| | | 229.4 | total |
| Rutherglen | | 121.6 | hours for work performed prior to November 25, 1996 |

dants make numerous objections to specific claims for work performed, in addition to several general arguments regarding the reasonableness of the hours claimed. This court will proceed in its analysis from specific to general

### 1. *Objections to Specific Claims*

Defendants have identified numerous instances where they believe that plaintiffs have failed to exercise appropriate billing judgment by including certain work in their petition for fees.

 Apart from the issue of travel time billed at an improper rate on July 14, 1994, which the court has already resolved, *see supra* note 5, defendants contend that Ms. Karlan's claimed hours should be reduced by 14.9 hours. The hours that defendants seek to exclude include time spent preparing to file the complaint, drafting retainer agreements, performing clerical tasks—including the filing of motions with the court, and miscellaneous time that defendants believe does not relate to the instant case. In addition, defendants resist being billed for the six minutes it took Ms. Karlan to draft a letter requesting additional seating for her clients at oral argument before the Supreme Court. Having reviewed defendants' objections and plaintiffs' motion for fees, this court concludes that defendants have valid objections with regard to 3.3 hours of the 14.9 hours that they claim Ms. Karlan improperly included. Specifically, we find that the .4 hours spent on April 28, 1994 and May 2, 1994 relating to the preparation of retainer agreements is time that normally would not be charged to a client. Similarly, attorneys cannot expect to be compensated at attorney rates for the performance of clerical tasks, thus we deduct 2.9 hours worth of claimed time relating to filing papers with the court.

In addition, we deduct .2 hours claimed by Ms. Karlan for travel to and from the clerk's office on May 13, 1994, to which defendants did not object. The balance of defendants' objections with regard to specific time claimed by Ms. Karlan are without merit; accordingly, Ms. Karlan's total hours will be reduced to 225.9 hours.

 With regard to Mr. Rutherglen, defendants' primary objection lies with his practice of billing in quarter-hour increments, which they contend leads to Mr. Rutherglen repeatedly charging more hours than his colleagues for the same work. Initially, this court notes that it is not uncommon for attorneys to bill in quarter-hour increments—it certainly does not evidence "aggressive billing"—nor is it a "departure from normal billing practice." *See* Defendants' Response at 16–17. Moreover, simply because Mr. Rutherglen charged a different amount of time for attending the same meetings does not mean he was overbilling. Instead, as plaintiffs explain, there are reasons for the disparities "such as the fact that one attorney may have prepared for or acted on the results of the conference while the others did not." Plaintiffs' Reply at 16. Finally, plaintiffs' May 2, 1996 "Motion for Summary Judgment" can hardly be termed an unnecessary motion. Accordingly, defendants' objections to specific hours' work claimed by Mr. Rutherglen will be overruled.

 Defendants make similar complaints as to Mr. Ortiz, contending that his time billed for specific meetings exceeds that billed by other attorneys who were in attendance. For the reasons stated *supra*, defendants' objections in this regard will be overruled. Moreover, to the extent that Mr. Ortiz chose to bill for meetings that other counsel chose not to claim does not invalidate Mr. Ortiz's claimed hours. Nevertheless, a

| | | 22.6 | hours for work performed after November 25, 1996 |
|---|---|------|--------------------------------------------------|
| | | 144.2 | total Ortiz |
| | | 88.3 | hours for work performed prior to November 25, 1996 |
| | | (2.0) | hours for time at Supreme Court that Mr. Ortiz chose not to bill, but which plaintiffs concede was improperly included in their original calculations. |
| | | (0.6) | correction to Mr. Ortiz's addition |
| | | 85.7 | total |
| Moglen | | 59.8 | hours total for work performed pr ior to November 25, 1996 |
| | × | 0.3 | correction to Mr. Moglen's addition |
| | | 60.1 | total |

review of defendants' objections with regard to Mr. Ortiz's claimed hours convinces the court that it should reduce the total hours requested by 4.4 hours because Mr. Ortiz's personal attendance at the May 18, 1997 hearing was of questionable necessity, given that Ms. Karlan and Mr. Rutherglen were already representing plaintiffs at the hearing, and because revising a résumé is not compensable.[6] The balance of defendants' objections are overruled as to Mr. Ortiz.

Finally, defendants argue that Mr. Moglen should be denied fees for the vast majority of his work—41.3 hours out of the 60.1 hours claimed—because presence was unnecessary and amounted to overstaffing by plaintiffs. Although it is not clear precisely which hours defendants seek to exclude, defendants apparently do not challenge those hours which relate to Mr. Moglen's work on the joint appendix. Defendants argue, however, that Mr. Moglen should not be allowed to bill for travel and attendance at oral argument before the Supreme Court, nor should he be permitted to claim fees in relation to a separate Washington, D.C. trip taken immediately prior to oral argument. As defendants note, the Supreme Court limits appearances to three attorneys per side. Mr. Ortiz has neither billed for his time nor sought travel expenses relating to his attendance at oral argument before the Supreme Court or the pre-argument meeting in Washington, DC. Accordingly, as to this specific contention, defendants' argument is moot. Moreover, because this court will address the issue of overstaffing in terms of defendants' general objections, it will not at present reduce the hours claimed by Mr. Moglen.

### 2. General Objections

▄▄▄ Up until now, the court has concerned itself with defendants' objections with regard to specific claims of hours expended during this litigation. Nevertheless, defendants' fundamental objection to an award of fees is that the claimed fees are, in toto,

unreasonable and unwarranted by the complexity of the litigation and the results obtained. To that end, the court will consider the Johnson factors, listed supra, to determine whether, on the whole, plaintiffs' claimed fees are reasonable.

By this litigation, plaintiffs sought to prevent defendants from charging delegates a fee to attend a state political party's nominating convention. To that end, plaintiffs have succeeded: "The imposition by an established political party . . . of a new prerequisite to voting for the party's nominee is subject to § 5's pre-clearance requirement." Morse, —— U.S. at ——, 116 S.Ct. at 1206. That plaintiffs' victory is tempered by the fact that the Voting Rights Act applies only to certain states does not detract from plaintiffs' success or otherwise minimize the results they obtained. Accordingly, the eighth Johnson factor counsels the awarding of a full fee.

Moreover, the court recognizes the novelty and difficulty of the question at issue. Defendants attempt to characterize this case as a simple issue of statutory construction, but the question of whether § 5 encompasses a political party's voter qualifications and procedures in the context of state nominating conventions is one of first impression. The generation of five separate opinions by the Supreme Court, although not dispositive of the issue, further illustrates the complexity of the issue. In addition, the court recognizes the court-imposed expedited briefing schedule, see Orders of May 11, 1994; the skill necessary for proper litigation of this case; and the superior experience, reputation and ability demonstrated by plaintiffs' attorneys. All of the aforementioned factors counsel awarding plaintiffs' attorneys a full fee.

Notwithstanding those factors that recommend the awarding of a full fee, this court is not unmindful that the retention of multiple attorneys often results in a duplication of

---

6. Plaintiffs argue that Mr. Ortiz's attendance at the hearing did not amount to overstaffing because defendants were represented at the hearing by three attorneys. That defendants may have overstaffed their side of the case is insufficient justification to award fees against defendants for overstaffing by a prevailing plaintiff. Moreover, the court has no way of knowing whether all of defendants' attorneys billed their clients for the time, nor is it relevant in the instant case where a prevailing party who seeks fees has a duty to minimize expenses.

efforts and an unnecessary increase in the amount of time expended and billed by attorneys. In particular, the court cannot help but conclude that the use of four superior advocates led, to some extent, to overstaffing. That being the case, in consideration of the time and labor required for proper prosecution of this case, we conclude that an across-the-board cut of ten percent of the hours claimed by plaintiffs is warranted to minimize and hopefully eliminate any duplication and overstaffing occasioned by the retention of Ms. Karlan and Messrs. Rutherglen, Ortiz, and Moglen. The other *Johnson* factors, while considered, do not alter this analysis.

As a result, the court will calculate and award attorneys' fees in the following amounts:

*Attorneys Fees to Be Awarded*

| | Hours Requested | Cuts | Subtotal (hours) | 20% Cut a | Subtotal (hours) | 10% Cut b | Subtotal (hours) | Rate ($) | Total Fee ($) |
|---|---|---|---|---|---|---|---|---|---|
| *Karlan* | 229.4 | 3.5 | 225.9 | 12.6 | 213.3 | 21.3 | 192.0 | 225 | 43200.00 |
| *Rutherglen* | 144.2 | — | 144.2 | 7.7 | 136.5 | 13.7 | 122.8 | 175 | 21490.00 |
| *Ortiz* | 85.7 | 4.4 | 81.3 | 6.2 | 75.1 | 7.5 | 67.6 | 175 | 11830.00 |
| *Moglen* | 60.1 | — | 60.1 | .7 | 59.4 | 5.9 | 53.5 | 175 | 9362.50 |
| | | | | | | | | Total: | 85882.50 |

a. Reduction for hours worked prior to May 19, 1994 on plaintiffs' claim against the North Committee. *See supra* part II.A. Percentages have been calculated on the basis of hours worked less any hours that were specifically cut. Accordingly, Ms. Karlan's pre–May 19, 1994 hours have been set at 63.2 hours, while the hours of Messrs. Rutherglen, Ortiz, and Moglen have been set at 38.5, 31.2, and 3.4 hours, respectively.
b. Reduction for duplication of efforts and overstaffing. *See supra* part II.C.2.

## III. *Costs and Expenses*

Having awarded plaintiffs attorneys' fees, it is now up to the court to determine the appropriate amount of costs and expenses to which plaintiffs are entitled. Plaintiffs have filed a bill of costs to which defendants have objected. In addition, plaintiffs have included an itemized list of expenses in their motion for attorneys' fees, which embraces those items previously claimed in their bill of costs. The court will address each attorney's claimed expenses separately.

### A. *Ms. Karlan*

Ms. Karlan seeks a total of $3918.66 in costs and expenses. $2516.31 of the expenses sought are costs related to the printing of briefs and the jurisdictional statement before the Supreme Court. The balance of the expenses sought are for photocopies, filing fees, transcripts, and travel expenses. In addition, Ms. Karlan seeks $942.00 in cost that already have been awarded by the Supreme Court. Defendants object to the reimbursing Ms. Karlan for the printing expenses because they argue that the costs of printing the briefs and the jurisdictional statement are not taxable under Supreme Court rules. In addition, defendants contend that certain copy and travel expenses are unnecessary or undocumented. Finally, defendants argue that the $942.00 awarded by the Supreme Court is already subject to a Supreme Court order, and thus further action by this court is unwarranted. Plaintiffs argue that defendants are misreading the rules, and that, in any event, even if the printing expenses are not taxable as costs, they are recoverable as proper litigation expenses under § 1973*l*. In addition, plaintiffs have provided additional documentation to support their other claimed expenses. This court will consider separately each of Ms. Karlan's claimed expenses.

### 1. *Printing Expenses*

Under 28 U.S.C. § 1920, a judge or the clerk of the court may tax the costs of printing briefs. Some courts have interpreted § 1920 to permit a prevailing party to recover the cost of printing briefs in the Supreme Court. *See Ad World, Inc. v. Township of Doylestown,* 634 F.Supp. 4, 11 (E.D.Pa.1985). The majority of courts, however, have held that in light of Rule 43.3 of

the Supreme Court Rules, "expenses of printing briefs, motions, petitions, or jurisdictional statements are not taxable" before the district court. *See Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 38 F.3d 1429, 1440 (7th Cir.1994) (finding that a prevailing party is not entitled to such expenses under Rule 43, and thus "[i]t should not be able to achieve an end run around that rule by seeking those costs in the district court"); *see also Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 957 (1st Cir.1984); *NLFC, Inc. v. Devcom Mid–America, Inc.*, 916 F.Supp. 751, 765 (N.D.Ill.1996); *Watkins v. Fordice*, 807 F.Supp. 406, 418 (S.D.Miss.1992), *appeal dismissed*, 507 U.S. 981, 113 S.Ct. 1573, 123 L.Ed.2d 142 (1993); *Jordan v. Allain*, 619 F.Supp. 98, 116 (D.C.Miss.1985); *Daggett v. Kimmelman*, 617 F.Supp. 1269, 1283 (D.C.N.J.1985), *aff'd*, 811 F.2d 793 (3rd Cir. 1987).

Rule 43.3 of the Supreme Court Rules states:

> The Clerk's fees and the cost of printing the joint appendix are the only taxable items in this Court. The cost of the transcript of the record from the court below is also a taxable item, but shall be taxable in that court as costs in the case. The expenses of printing the briefs, motions, petitions, or jurisdictional statements are not taxable.

A consideration of the full text of Rule 43.3 persuades the court that the majority of the courts are correct in their conclusion that Rule 43.3 bars a district court from taxing the costs of printing Supreme Court briefs and jurisdictional statements. The first sentence of Rule 43.3 states that the printing of the joint appendix is the only taxable item before the Supreme Court. The second sentence recognizes that the cost of a transcript of the record below is taxable, but only in the court below. The third and final sentence, which deals with expenses stemming from the printing of briefs and jurisdictional statements, recognizes that such expenses are not taxable. Logically, if the Court wished such items to be taxable before the district court,

it would have included language similar to that which is found in the second sentence of Rule 43.3; namely, "but shall be taxable in [the district] court as costs in the case." The Supreme Court Rules having failed to include such language, this court will not permit plaintiffs to use § 1920 to tax expenses resulting from the printing of briefs and the jurisdictional statement before the Supreme Court.

 Having found that the costs of printing briefs and jurisdictional statements are not taxable, the court must now consider whether such costs are reimbursable as attorney expenses under § 1973*l*. In *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 957 (1st Cir.1984), the First Circuit concluded that the term "reasonable attorney's fees" in the context of § 1988 did not include those items for which recovery was barred under Rule 43.3.[7] The court in *Duncan v. Poythress*, 572 F.Supp. 776, 781 (N.D.Ga.1983), *rev'd on other grounds*, 777 F.2d 1508 (11th Cir.1985), came to a similar conclusion. Plaintiffs have failed to cite any authority supporting the interpretation that such costs are recoverable as attorneys' fees. Accordingly, we find that the expenses of printing briefs and jurisdictional statements before the Supreme Court are not recoverable expenses as part of a reasonable attorneys' fee under § 1973*l*.

### 2. Miscellaneous Expenses

 Ms. Karlan seeks reimbursement for photocopies, filing fees, district court transcripts, and travel expenses. Having considered the documentation provided by Ms. Karlan, we find that defendants' objections are meritless and will be overruled.

### 3. Costs Subject to a Supreme Court Order

Ms. Karlan asks this court to enter an order directing defendants to pay $942.00 in costs already awarded pursuant to a Supreme Court order. *See* Order, *Morse* (No. 94–203) (Mar. 27, 1996). The Supreme Court having already ordered defendants to pay plaintiffs $942.00, we see no need to enter an

---

**7.** Although *Grendel's Den* refers to Rule 50.3, the current version of this rule is located in Rule 43.3.

**370**

additional order. Plaintiffs may apply to the court for relief if defendants refuse to abide by the Supreme Court's order, but at present no further action is needed.

For the aforementioned reasons, plaintiffs will be awarded $460.35 in expenses incurred by Ms. Karlan as part of a reasonable attorneys' fee.

### B. *Mr. Rutherglen*

 Plaintiffs seek reimbursement for $896.48 worth of expenses incurred by Mr. Rutherglen during the course of this litigation. These expenses include telephone calls, photocopying, travel expenses, postage, and secretarial services. Defendants object to many of Mr. Rutherglen's claimed expenses for lack of documentation and necessity. Nevertheless, plaintiffs filed additional documentation in their reply brief, which goes a long way towards alleviating defendants' concerns regarding documentation. Although plaintiffs have been unable to provide receipts for some minor copying and telephone expenses, this court relies on counsel, as upstanding members of the bar, to represent accurately expenses that have been incurred. That being the case, the failure to produce certain minor receipts should not bar reimbursement of expenses.

The only claimed expense that gives this court pause relates to a meal that Ms. Karlan and Messrs. Rutherglen and Moglen enjoyed in Washington, D.C. Although this court is not unmindful of the fact that fine dining can be expensive, it questions whether a $185 dinner reflects appropriate billing judgment. This court doubts that it would submit such a bill—even for three attorneys—to a client unless the client were present at the dinner to enjoy the fruits of his labor. That being the case, we reduce this expense from $185 to $150.

For the reasons stated above, plaintiffs will be awarded $860.37 in expenses incurred by Mr. Rutherglen as part of a reasonable attorneys' fee.[8]

---

8. This amount also reflects a correction to Mr. Rutherglen's addition, his receipt for November

### 1. *Mr. Ortiz*

Plaintiffs seek reimbursement for $60.00 in mileage expenses incurred by Mr. Ortiz during travel to and from Roanoke for the hearing. Although we have disallowed Mr. Ortiz fees for this hearing, *see supra* part II.C.1, neither Ms. Karlan nor Mr. Rutherglen have claimed travel expenses relating to their attendance at the hearing. It being evident that Mr. Ortiz drove his fellow attorneys to Roanoke for the hearing, it appears appropriate that he at least be awarded the expenses relating to that endeavor.

### IV. *Summary*

In sum, for all of the aforementioned reasons, plaintiffs will be awarded a total of $87,263.22 in reasonable attorneys' fees, that sum representing $85,882.50 in attorneys' fees and $1380.72 in expenses.

An appropriate order this day shall issue.

---

15, 1994 totaling $6.65 rather than the $7.03 claimed.